Good morning. I'm Adam Preston. I represent the plaintiffs who are also the appellants in this case. And with permission, I'd like to reserve five minutes for rebuttal. Although I think that this case may well be the simplest case you may be hearing today, even though we wrote 100 pages of briefs. That's good. Don't feel obligated to use all of the time because we've given you as much time as we give the ex-convailees. OK. Well, there is a certain similarity to the ex-convailees in that we have a sink a story of a sinking ship. And the question and the question is, did the pilot give sufficient warning that the ship was going down? And that's what this case is about. And the simple question at the heart of your honor's decision is going to be, did these defendants make representations concerning the existing business condition of this company or didn't they? The defendants say all they made was forward looking statements. We'll believe we'll we'll be fine in the future. The plaintiffs allege that they made statements not only about what they believed the future would hold, but also about the present. And that makes a tremendous difference under the federal securities laws, as I hope our briefs have made clear. Would you focus on the March 1st press release? Certainly. The March 1st press release, as we stated in our brief, came about four weeks before very important financial deadlines were about to arrive at this company. And at the end of March, they were going to have to pay twenty five million dollars back to their to their lending banks. A few weeks after that, they were going to have to find one hundred and fifty million dollars to pay for their cable, their undersea cable investments. And they've been looking for financing for well over a year to enable them to make these enormous payments. And they hadn't found it. They disclosed in the past that they were looking. Defendants make a great case about that. Yes, they said they were looking. They also said they were expecting to have no problems in finding this financing. We also know from a filing that they made in the bankruptcy court that at the end of 1999, after trying and failing to get this financing from the various lending banks, they resorted to hiring investment bankers to try to sell debt securities in a private placement and that the offering was never made. We know that. On March the 1st, they were now a few weeks away from their deadline. And what was the situation? The situation was they didn't have the money and the deadline was upon them. The chances that they believed at that point they were going to get the money are either slim or none, depending on whether you stand with the plaintiffs and defendants is either slim or none. They did not disclose this. Whatever the risk may have been months earlier concerning their ability to raise this money, by March the 1st of 2000, the risk level had escalated dramatically. They were now no longer at a yellow alert. They were at an orange alert or higher, whatever the highest alert level was. One can only imagine what they must have been thinking every night when they went to bed. How are we going to get past this monumental obligation without the money in hand and after all these months of unsuccessful efforts? And so what did they say? What did they tell the public? They issued this press release, which, as the court is well aware, expressed delight at how well the company had been doing and about how the stage was now set for dramatic expansion into the Internet cable business. And by expansion, they were referring unquestionably to this underseas cable investment that they were about to make that would enable them at long last to become international players in the Internet service provider business. But they knew when they said that the stage was now set, a statement which the district court viewed as being simply puffery, the context in which they made that statement is all important. The context was we're now ready to go forward with this investment. We've been trying to get the financing for it. We've been telling you about our efforts to get the financing for it. The stage is now set to go ahead. A reasonable investor reading that statement would assume that the company's present business position was it was in a position to go ahead with those cable investments. Can I ask you, this is on precisely that same press release, the first sentence says, quote, we are delighted with the financial results for 1999. What's the meaning not of delighted, but of financial results? Is there a technical meaning to that? Is there a generalized meaning to that? How am I to interpret those two words? Well, what I would interpret them to mean is these were the preliminary results for the fiscal year 1999, which they were at the present moment compiling into a final form, which was going to be included in their 10 K, which was due out at the end of that month. So what I believe they were referring to was they had done their preliminary calculations of what those numbers would be. And they wanted to report. They wanted to jump their own gun and give the marketplace some idea as to what those numbers were going to say. The ones that were going to come out at the end of the month. Beyond that, I don't know that there's a specific term of art that when they refer to the financial results. What I assume that to mean is everything that's going to be disclosed in their 10 K, their financial statements, their earnings, their liabilities, their assets and their liquidity situation. I hope that answers your question. I'm not sure. I'll go to the other side on the same question. I'm trying to figure out whether within the scope of that statement is a reasonable understanding by an investor that, for example, those five major vendors by the end of 1999 had indicated that they were going to cut off services for failure to pay bills and that there were millions and millions of dollars of bills from various vendors stacked up at the end of 99 that were unpaid. Is that within the scope of the term financial results? Well, I will say this, that a statement of being delighted with financial results is, in my estimation, fundamentally inconsistent with the situation that you were just alluding to. Namely, most people would not be delighted to have 60 million dollars of unpaid vendor invoices sitting there and rooms full of checks to vendors that they had been unable to send out because they didn't have the money to pay it. However, I would say that the word delighted is, of course, a fuzzy, soft statement. Nonetheless, the impression that was created, and I think impressions count, is that this company is in OK financial condition and that there's certainly nothing inconsistent with what they'd previously been saying about their financial condition, including that they expected to be fully funded through the end of the year 2000. That statement was never changed, revoked, or modified right up to the very day that this company went essentially belly up on April 1st, when they finally disclosed that, well, we're not so delighted. Our financial results aren't so delightful. We're having a going concern problem being expressed by our own auditors. We can't make the payments to the banks. We can't make the payments to the cable companies. Someone could assume that they just figured that out the night before they released that statement, but I don't believe that's a tenable assumption. I can't prove the very day that they found out for sure that they weren't going to be able to make these payments. However, I do know that on March the 1st, they knew that as of that date, they couldn't, and it was getting very late in the day. Have I answered everything you wanted to hear about that? Focusing on that press release, and he said the stage is now set, seems to imply not in the future or aspirational aspects, but right currently it was set. And then the statement that we are set to be a major player in the global Internet market, when it appeared to me that in all probability, he knew in all probability, that their financing would dry up within one month. But are these deliberately reckless statements in your opinion? Could you clarify for me why these are deliberately reckless? Well, if you have been trying for a year and a half to come up with financing and you haven't done it, and you have no visible means of support, and you say something like this, I think that's reckless. I mean, it's like me telling the bank that I'll send you the check tomorrow, and I don't have any money in my bank account. I think that's pretty reckless. And no likelihood of getting any? No likelihood. I mean, look, they hired these investment bankers in late 1999. That we know. They put that in writing, so we know it. It doesn't take six or eight months to find out whether those investment bankers are going to have any success. Anyone who has any knowledge of how the securities markets works knows that it doesn't take that long. Barring some peculiar fact, which is not in evidence, not in the record, that indicates that this was taking extraordinarily long for some unknown reason, one would have to assume that either the offering had collapsed or that it was in such a parlous state that they could not reasonably have been optimistic. And if you misstate your own optimism, you're committing a fraud. And the company at that time had defaulted on its debt, $60 million in debt to various vendors, et cetera, and it had stopped paying all its vendors. Is that correct? I don't know if it's all its vendors, but $60 million is a very large proportion of vendors for a company of this size. And in our reply brief, we spent a lot of time going through quite a few of these proofs of claim. They're all these vendors filed in the bankruptcy action. And you can see somewhere in 1999 in almost every case, or at least in many of the cases, Pacific Gateway stops paying. They stop paying this one. They stop paying that one. The bills start accumulating, piling up higher and higher. That's a lot of bills. And the notion was raised in the district court, and the district court actually accepted this, that this speculative notion that maybe all of a sudden Pacific Gateway got into a series of disputes with all of so many of its vendors and they were having real fights with them. All of a sudden, all these people. I think they were. They weren't paying their bills. Well, there's a difference. And that produced the fight. There's a difference between having a legitimate dispute, such as you might have had in the Vizics case where the court was talking about a patent dispute where a company may have believed in its innocence and litigated it and finally lost. Here we don't have any indication of that. This is just a deadbeat. This company became a deadbeat. And a year later, when the company's bankruptcy bar date was about to occur and everybody had to put in their proofs of claim, all these amounts were still outstanding. No checks had arrived in the mail. Any 180-day clearing period that the district court speculated may have been responsible for all this, that had all gone by. All these claims were net of any offsetting of balances owed. It seems to me that one thing I feel most comfortable about is that this company, we had more than sufficient evidentiary support for the allegation that this company cut off these people because they couldn't pay them and not for any other reason. I don't know what other information we could possibly have had. The district court thought we should litigate any potential defense that the company could have had to all of these bills. I don't know what their potential defense is. There's nothing in the complaint about any of these potential defenses. I think and I sense that the court realizes that Pacific Gateway wasn't paying its bills. And while it wasn't paying its bills, it was saying that existing cash balances are sufficient to cover their current operating requirements and current capital expenditures. That's another statement that it's just incredible that they could say that. With these rooms full of checks that they haven't been able to send because they don't have the money to cover them, with vendors cutting them off, with dunning notices coming into these defendants themselves personally, with the president of the company being reduced to haggling with salesmen about them getting paid, this is a catastrophe. This is the Exxon Valdez. It's taken on water. It's going down. And these people are saying everything is hunky-dory. And that's as bad as it gets under the federal securities laws. These defendants may be small fry. They may not be Kenneth Lay or Bernie Evers or any of these other people who are in the headlines. But they're just as bad. I don't know why they did this other than perhaps they hoped that if they could keep the game going for as long as possible, something might happen to save them. But you can't gull the public like this. Okay. If you want to save some time for rebuttal. Thank you. Thank you. May it please the Court, Bruce Erickson for appellees. I think it's important to focus on the last time period, the period between the 15th of November, 1999, and the 31st of March, 2000, and to look at what the defendants said and at what they did not say in that period. Well, to focus that, I'm obviously interested in that March 1st release and why Chairman Nickowitz wasn't reckless when he said we're set to be a major player in the global Internet market. When the company was leveraged to the hilt with debt, 25 million of that debt was scheduled to mature in less than 31 days. It had already defaulted on 60 million of its previously held debt. Its line of credit was scheduled to be reduced by 50 percent in four weeks, and the financing for the construction of its undersea cables was all but exhausted. I mean, all of those things combined make me ask the question, why wasn't this a reckless statement? All the things Your Honor just mentioned, the amount of money that was owed for the cable, the state of the financing, all that had already been disclosed to the market, Your Honor. If you look at the 10-Q for the third quarter, which was the last filing before that press release, this is the 10-Q I was just about to talk about, the one that was filed November 15. If you look at that 10-Q, it discloses every one of those things you've mentioned, Your Honor, to the market. It says that we have capital commitments of over $145 million. It says our people knew from previous filings that their annual income was under $20 million. It says accounts payable have gone way up to over $169 million. It says we have cash of $15 million. $15 million in cash is against $145 million in capital commitments and $169 million in accounts payable. It discloses the state of the financing. They previously said we had a line with Goldman Sachs and with Salman that it lapsed. But are you arguing that the investors should look to those statements as a matter of law, that they're required to know what's in those statements and that they can't rely on what is stated by the public, by the company to the public? I'm talking about what's in the 10-Q. Yeah, I understand that. Public documents that I think investors can rely on. No, I'm saying as a matter of law, do they have to look at those? Are they bound? Are they charged with notice of everything that you file in those 10-Qs? The 10-Qs are public documents before the investing public. Yes, they are. What I'm saying is all of them. So you can lie in a press release, but as long as you disclose it to the SEC, you're okay? I'm not saying that, Your Honor. I'm not saying, and I'm certainly not agreeing there's any lying in this press release. What I'm saying is these facts that Judge Nelson referred to, the financial situation of the company, it was all been placed before the investors over and over. And the company had said in the Q, the last Q from the third quarter, November 15, it said, and I quote, additional financing arrangements are necessary for the company to satisfy its capital requirements, and the failure to obtain such arrangements could have a material adverse effect on the company. It went on to describe what they were doing and then said the timing in terms of any financing activities will be subject to market conditions. In other words, we don't have enough money. We need to raise money. If we don't raise enough money, we are going to be in dire straits. This was said to the market. Now, let's go, and that's the last filing before the press release of March 1. Now we go to the March 1 press release. What does it say? It expressed delight with financial results. So, yeah, we are delighted with the financial results for 1999. That is a retrospective rather than prospective statement. That sentence I would agree, and what it's referring to, Your Honor, I would suggest to you are the results on page 3 of that earnings release. They are the financial results that are there. Record revenue, record gross profit, net income that's down 50 percent from the previous year. And delighted seems to be corporate speak for we are terribly concerned and we may go bankrupt in a month. No, I think he's expressing maybe more optimism than in hindsight one would have given. No, I'm not talking about hindsight as of March 31. I'm talking about what did he know about the financial condition of his company as of March 1 when he says we are delighted with our financial results for 1999. What was the financial condition of that company at the end of 1999? The financial condition of the company on March 1 and at the end of 1999 was exactly what was said in the last 10Q that I just quoted a moment ago, which was we have to raise additional money or we're in dire straits. That's what was said. No, I have to say that's not what it says. There comes a point at which maybe an ignorant federal judge doesn't understand what the financial world understands as English, but this does not strike me as something that I would be delighted about or anybody would be delighted about as of what happened at the end of 1999. How can that possibly be? They're terrified. And a month later, they're bankrupt. No, not a year later. Oh, I'm sorry. Not a month later. Oh, I said a month later, they fess up. A month later, they go through at the end of the month. But, Your Honor, here's the point. There are no facts alleged in the complaint to show that the financing efforts had failed by March 1. I'm not asking about that. Sorry, I'm not talking about the financing efforts. I'm talking about what were the – how am I supposed to understand financial results as of the end of 1999? I'm supposed to exclude from financial results the fact that they've got such trouble paying their bills that they've got five major vendors who have simply cut them off, given them notices we are not going to deal with you anymore, all these other problems. Those are not part of their financial results for that prior calendar year? Financial results are the numbers that are set forth in the press release. Matters about liquidity and so on are matters that are dealt with in quarterly filings. They are not addressed in this press release. There's not a word, one, about financing or about liquidity. There are no material omissions or anything that might reflect on or might tell a reader that maybe there's no reason for this optimism? So when it says, as of March 1, the stage is now set – I mean, let's take January, February, March. He's speaking as of March, when he knows all of these other things that I described. The stage is now set for major expansion and said, we are set to be a major player in the global Internet market, knowing at the time that statement is made all of the things I just described about the debt, et cetera. Isn't that misleading? No, Your Honor. It is at worst puffery. It is at worst, in retrospect, unduly optimistic. But what the company has previously told the market is, look, as an operating company, we make money. That's a true statement. This is what we've been doing. It makes money. That remains a true statement. But we've – our margins are declining. That's been disclosed over and over again. Our business is increasingly competitive. That's disclosed over and over again. Our prices are going down. That's disclosed over and over again every quarter. Therefore, because our core business is declining, as we've told you, we are going to make a big effort at diversification. We are going into this undersea cable business. We're going to be part of this cable to Japan, this cable to Europe. And it's going to cost us enormous sums of money, over $150 million, which is money we don't have. And that is disclosed over and over again. Therefore, we need to raise money in the market, debt offering, big borrowings of some sort. To make our commitments, we have to raise money. That's been disclosed over and over again. It was true in January. It was true in February. It was true on March. They had to raise that money. There is nothing in the complaint that suggests that the efforts to raise that money had failed by March 1. There is not one fact in the complaint that suggests there had been any sort of failure. All you heard opposing counsel say was, well, how long can it take bankers to raise money? How long can it take? It doesn't take 6 or 8 months. Well, it hadn't been 6 or 8 months. It had been from December to March. There is not one well-plugged fact that shows that there was any reason not to be optimistic about raising the money. And there is nothing to suggest that if they had raised the money, they couldn't have paid these bills forthwith and gone forward with their diversification program. The mistake that opposing counsel makes is to treat financing and liquidity as if they were separate subjects. They are not. As the company has said, we need the financing to pay our bills that have been disclosed in the November queue and over and over. We need the financing to pay our bills because we've incurred these great obligations for the purpose of diversification. Here, the optimism being expressed, and I fully agree that in the cold light of morning, knowing what we now know about the crash that hit tech and that hit telecom starting in late March 2004, it all looks rather unduly optimistic in retrospect, but there is nothing untrue here. The financial results for 99 are set forth. The revenues and so on are accurately stated. It doesn't speak to the financing, and there's no reason, there's nothing in the complaint to say that there was any reason not to be optimistic about doing the financing. Nothing whatsoever is fled, and that is the central failing of this, is the failure to plead any facts. I mean, not any facts at all that show this financing had failed. To be sure, it had failed by the end of March. By the end of March, they had had to work out an extension. They had to cure the default with the bankers. The things that are candidly disclosed in the K had happened at the end of March, but there's nothing to show that this was a foregone conclusion, or indeed, it even happened, or even started to happen by March 1. When counsel said, what were the chances on March 1, slim or none, of doing the financing, does he cite any facts? Does he mention anything at all? No. He simply asserts a conclusion, slim or none. Nothing supports that. There is not one well-pled fact anywhere in the second-mended complaint to support the notion that this financing had failed, and that is the critical point, because the company was going to live or die depending on its ability to obtain financing from Wall Street, and nothing shows that optimism was unwarranted or that that financing effort had failed by March 1. Nothing whatsoever. Bear in mind, Judge Hamilton, at the end of the oral argument below, said to these people, do you want to amend? Is there anything else you want to add to your complaint? And they said no. They had several chances. This was the third go-around already. She offered them another opportunity. They didn't take it. They didn't have anything to add because they have nothing to add. There is nothing to show that on March 1, optimism as to financing was unwarranted, and it's in a case under the PSLRA, you need some facts. You can't just go, this is the way Wall Street works, or financings are usually obtained more quickly than this. You need some facts to satisfy your burden. They didn't have any below. They don't have any here, and they declined to amend. That is the key point. That is why, though the optimism of March 1 may seem in hindsight misplaced, nothing shows it to be wrong, and here I think is the key point. Nothing shows it to be not just wrong, but reckless, deliberately reckless within the meaning of this Court's Sciander decisions. We're talking especially about an omission, which is what we're talking about here. It's what you didn't say. The test, as this Court said in Silicon Graphics and reaffirmed last year in the DSAM case, is were you so, let me find the exact words here, was it such an extreme departure from the standard of ordinary care? Was the danger of misleading by silence known or so obvious that the actor must have been aware of it? That's in Silicon Graphics repeated in DSAM, as they say. That the silence reflects the requisite state of mind. There's nothing here to suggest that that's the case, nothing whatsoever. Particularly so because what we're talking about is an omission. This is mid-quarter silence on a point. As this Court said in Brody, you don't need to speak to everything because you speak to some things. Here they're talking about, you know, the 1999 results. They're not talking about liquidity. They're not talking about financing. Indeed, the only place in the March 1 press release that financing is even mentioned is in the safe harbor language at the end on page 4 of the press release where the Court lists risk factors. What is risk factor number one? Adequacy of funding sources to meet capital requirements. That's the only thing in that press release that even refers to financing or anything like that. It says it's risk factor number one. Other than that, there's the no one is speaking to it. So we're looking at an omissions case as to which the cyander standard is your failure to speak such an extreme departure from ordinary standards that you must have known it would mislead. There is nothing to show that. Nothing whatsoever in this case. Bear in mind that liquidity and financing are, under our system, the kinds of things that are required to be disclosed at the quarter and not otherwise. They are required to be discussed. Let me ask you this. The March 31 report was late, correct? No. I'm reading. The registrant was unable to file its annual report timely, primarily because it was negotiating an amendment, an extension and waiver of certain defaults with its bank group. I'm just I'm just reading from the March 31 filing. It says that I stand corrected. It might have been 15 years ago. You normally face your file in March. It can't be your company. It says that I stand corrected. Yeah. Well, my next question was going to be and I guess as you stand here, you couldn't give me the answer. When should it have been filed? I guess if you didn't know it was late, you don't know if you stand here when it should have been filed. It wouldn't have been before March 15th, I don't believe. Okay. For your company, you filed it today in March. Okay. Okay. No, it doesn't say how late. It just says late. It wouldn't have been before the 15th. Okay. As I was saying a moment ago, and I realize I've got to wrap it up here. The normal regime under the rules regarding K's and Q's and what it says in Regulation S.K. and so on is that you're obliged to discuss liquidity and things like that at the quarter in your K's and in your Q's. There's no law whatsoever that suggests any sort of mid-quarter obligation to speak to those subjects. They haven't cited anything because there isn't something. I mean, there are now, for example, proposals before the SEC to add such requirements. They haven't been acted on. This is with respect to the 8K. But there was no duty at the time to speak mid-quarter about liquidity, and therefore, a for surei, no case whatsoever that it was an extreme departure from a nonexistent standard to not to speak to liquidity. There simply was no duty and no departure at all not to speak to that subject. I recognize my time is almost up. Let me finish by where the Chief Judge started by referring to Exxon Valdez. I mean, the striking thing about this case is that these were captains who went down with their ship. They didn't sell a share of stock at any relevant time. Sandra Gay had sold 5,000 shares a year ago. But the millions and millions of shares they held, they held all the way to the bitter end, right into bankruptcy at the very end of 2000. This isn't your typical case where you've got people lining their pockets or anything like that. Not at all. They just had no ulterior motive here, no duty to speak, and there's absolutely nothing to suggest any sort of scientific, certainly nothing that meets this Court's test for scientific. Unless Your Honor has any further questions, I'll rest and urge you that Hamilton did a good job below. It's a well-reasoned opinion. It ought to be affirmed. Thank you. I don't have much to add at this point other than to say that they did make statements. They did make affirmative statements about their own liquidity. The stage is set for Internet expansion is a statement of current business conditions no different from the one that this Court in America West just held to be a statement of present fact. There is no question in my mind that they were signaling to the investment community that they were prepared to go forward with all these plans. And you can just imagine what the effect would have been if they had included in this March 1st release the statement that after saying that the stage is set, if they had said, oh, but by the way, we don't have the money to do it, and we're sort of hoping it comes in in the next couple of weeks, that would have been candid. That would have explained the true situation to the public. But they didn't say that. It was pure optimism from beginning to end. And in this context, the stage being set is, I submit, a specific affirmative representation concerning their own liquidity, which was a misrepresentation. Just as they misrepresented in the past that they were meeting their prior bills, they were misstating now that they were in a position to meet their current bills. Can you tell me when the March 31 report should have been made? I tried to figure that out. You also don't know? You picked up something that I had not noticed. Well, in other words, it's not in your complaint. No. As far as I know, it's not. Okay. Okay. Sorry. Thank you. Thank you. The case just argued is submitted for decision. That concludes the court's calendar for this morning. The court stands adjourned. All rise.
judges: Schroeder, Dw Nelson, W. Fletcher